In re COMPUTER ENGINEERING ASSOCIATES, INC., Debtor.

John Desmond, Chapter 7 Trustee, and First Trade Bank, FSB, Plaintiffs,

v.

State Bank of Long Island, Advanced Testing Technologies, Inc., Eli Levi and Hector Gavilla, Defendants.

Bankruptcy No. 95–17972–JNF.
Adversary No. 97–1599.

United States Bankruptcy Court, D. Massachusetts.

Aug. 21, 2000.

Kenneth A. Martin, Martin & Rylander, P.C., Washington, D.C., for First Trade Bank of L.I.

John O. Desmond, Framingham, MA, pro se.

David C. Phalen, Bartlett, Hackett & Feinberg, P.C., Boston, MA, for defendants.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Plaintiffs' Third Amended Complaint against the Defendants, State Bank of Long Island ("SBLI"), Advanced Testing Technologies, Inc. ("ATTI"), Eli Levi ("Levi") and Hector Gavilla ("Gavilla"). The Third Amended Complaint relates to a

contract between Computer Engineering Associates, Inc. ("CEA" or the "Debtor") and the United States Air Force at Kelly Air Force Base in Texas pursuant to which the Debtor agreed to provide sophisticated testing and engineering services and utilized ATTI as a subcontractor. The Court previously ruled upon SBLI's Motion for Summary Judgment with respect to the Second Amended Complaint filed by the Plaintiffs, John Desmond (the "Chapter 7 Trustee") and First Trade Union Savings Bank ("FTU" or the "Bank") (collectively, the "Plaintiffs"). The Court heard the Motion for Summary Judgment (the "Motion") on April 28, 1998, and, in a decision dated August 5, 1998, granted in part and denied in part SBLI's Motion. The Court granted SBLI summary judgment with respect to Counts II through VIII, denied summary judgment with respect to Count I and ordered the Plaintiffs to file a Third Amended Complaint within 14 days.

The Plaintiffs filed a Third Amended Complaint. ATTI, Gavilla and Levi filed a joint Answer in which they asserted eleven affirmative defenses. SBLI also filed an Answer to the Third Amended Complaint (the "Complaint").

The Court conducted a three day trial with respect to the allegations contained in the Plaintiffs' Complaint. The Plaintiffs identified the counts as follows: Count I: 11 U.S.C. § 548; Count II: Conversion; Count III: Turnover; Count IV: Preferential Transfer (ATTI and SBLI); Count V: Insider Preferential Transfer (ATTI, Levi and Gavilla); Count VI: Accounting; Count VII: Breach of Duty of Good Faith and Fair Dealing owed to Trustee (ATTI and SBLI); and Count VIII: Fraud (All Defendants). The Plaintiffs, in their Complaint, indicated that Count VI had been withdrawn. The Plaintiffs did not submit evidence with respect to Count VIII or mention it in their Post–Trial Brief. Thus, the Court finds that Count VIII has been waived. Additionally, in their Post–Trial Brief, the Plaintiffs clarified the allocation of claims as follows:

Plaintiff FTU asserts the following claims: (1) conversion; (2) turnover. Plaintiff John Desmond, Chapter 7 Trustee, asserts the following claims: (1) preference; (2) fraudulent conveyance; (3) insider preference; and (4) breach of good faith and fair dealing. (Plaintiffs' Post–Trial Brief, p. 25).

The Plaintiffs did not clarify for each count the specific relief, if any, they are seeking against each named defendant, although in their Post–Trial Brief, for example, they suggested that Levi and Gavilla are liable under both 11 U.S.C. § 550 for an alleged fraudulent conveyance and 11 U.S.C. § 547 "[t]o the extent [they] personally engaged in the transaction by pledging personal assets and guarantees to obtain SBLI's participation...." (Plaintiffs' Post–Trial Brief, p. 41). Similarly, the Plaintiffs did not specify a dollar amount with respect to the relief they request in the various counts of their Complaint.

The Court now makes the following findings of fact and rulings of law in accordance with Fed.R.Bankr.P. 7052.

## II. PROCEDURAL BACKGROUND

The Debtor filed a voluntary petition under Chapter 11 on November 24, 1995. It operated as a debtor-in-possession for less than five months. In April of 1996, it voluntarily converted its Chapter 11 case to a case under Chapter 7. On May 1, 1996, John Desmond was appointed Chapter 7 Trustee.

Less than one month after the filing of the Debtor's bankruptcy petition, on December 11, 1995, FTU filed an Emergency Motion for Relief from Automatic Stay. In its Motion, it stated that the following:

The primarily [sic] collateral of the Bank are accounts and related contracts and contract rights principally with respect to certain bonded and unbonded construction jobs of the Debtor. The Debtor's posture with respect to these various jobs is very fragile, and Debtor is subject to being in breach of these jobs

and thus Bank's collateral is in serous [sic] jeopardy of being severely diminished or lost entirely unless these jobs proceed and are completed in due course.

As demonstrated by Exhibit B (these numbers are approximate as work has continued since they were prepared several weeks ago), even if the jobs which are collateral of the Bank are fully completed as projected given the issues that will undoubtedly arise, *there is no equity in this collateral.*

(emphasis supplied). On Exhibit B, FTU listed "USAF—Kelly AFB" as a receivable. It indicated that the "backlog amount" was $35,176; that the account receivable as of 10/12/95 was $685,400; that the total estimated cost to complete was $62,812; that accounts payable were $298,380; that there was a negative cash flow associated with the receivable of $27,-636; and that "Final Settle" [sic] was $359,-384. The Court scheduled a hearing with respect to the Motion and, on December 20, 1995, granted FTU relief from the automatic stay.

On June 6, 1997, the Trustee filed an Application to Employ Special Counsel, Kenneth Martin ("Attorney Martin") and the law firm of Martin & Rylander. Specifically, the Chapter 7 Trustee sought authority to employ Attorney Martin "to pursue collection of a preference and conversion action against a company that received prepetition funds from the Debtor." The Chapter 7 Trustee stated that he and FTU had "agreed that the net recovery, after payment of attorneys' fees and costs, will be divided between First Trade Union and the estate, with the bankruptcy estate receiving 20% of such net recovery and First Trade Union receiving 80% of such

net recovery." The Trustee disclosed that Attorney Martin represented FTU. In the affidavit filed in support of the Application, Attorney Martin did not disclose any connections with the Debtor or its principal, John Solomon.[1] After notice and a hearing, the Court authorized the Chapter 7 Trustee to employ Attorney Martin. The Court, however, indicated that it did not believe that the FTU had a security interest in any avoidance power recoveries that the Trustee might obtain pursuant to 11 U.S.C. §§ 547–550 and that it would not determine how the proceeds of any recoveries would be divided among the Bank, Attorney Martin and the estate until such proceeds existed.

## III. FACTS[2]

### A. *The Parties*

CEA was a corporation organized in Massachusetts. It was in the business of providing hardware and software support for computer systems to government entities and businesses and installing electronic security systems. Its customers included local school districts, state prison agencies, the United States Bureau of Prisons, and the United States Air Force. When it filed its Schedules and Statement of Financial Affairs, CEA's liabilities, which it indicated included secured claims of $2,482,054.71, priority claims of $761,115.44, and unsecured claims of $3,947,529.55, exceeded the value of its assets. It disclosed assets with a total value of $6,294,372.29.[3]

At the commencement of CEA's bankruptcy case, the value of its assets was vastly overstated. John Solomon ("Solomon"), the chief executive officer of CEA, testified that many of the accounts receivables were not collectible because CEA

---

**1.** *See* Fed.R.Bankr.P. 2014(a).

**2.** Many of the pertinent facts are set forth in the Joint Pre–Trial Memorandum, which the Plaintiffs submitted as a trial exhibit, and are not in dispute. Because the parties submitted proposed findings of fact incorporating many of those in the Joint Pre–Trial Memorandum,

the Court has paraphrased the parties' proposed findings of fact in appropriate circumstances. *See* Plaintiffs' Exhibit 62.

**3.** It inaccurately listed the total as $10,683,370.29 on its Schedules due to a mathematical mistake.

had defaulted on its contractual obligations, had not begun performance, or had determined that the cost of completing punch list items exceeded the value of the retainage due under the contract.

The Chapter 7 Trustee, John Desmond, testified that the bankruptcy estate was administratively insolvent. He stated that he had approximately $70,000 in cash on hand, that approximately 232 claims had been filed, and that administrative claims, including priority claims, totaled approximately $462,000. The Chapter 7 Trustee did not include ATTI's administrative claim of $387,000 in this total. He stated that administrative claims totaled approximately $544,000, including ATTI's claim, and that priority claims which may be allowed as Chapter 11 administrative expense claims totaled approximately $306,000. He added that priority wage claims totaled $173,000, of which $49,000 would be allowable by operation of 11 U.S.C. § 503(a)(3), that priority tax claims totaled $669,000, and that unsecured claims, including secured claims for which there is no collateral, totaled approximately $8.3 million.

FTU is among the creditors asserting claims in CEA's bankruptcy case. It is owed, according to the testimony of a bank officer, the following: 1) the principal balance due on its line of credit, as of December 1999, in the amount of $861,170.45; 2) interest on the line of credit, as of December 8, 1999, in the sum of $227,037.53; 3) late charges associated with the line of credit in the amount of $17,600.76; 4) the principal due on the term loan in the amount of $701,080.97; 5) interest on the term loan, as of December 9, 1999, in the amount of $226,508.30; and 6) late charges associated with the term loan in the amount of $13,807.00.[4] Solomon and James McCorry ("McCorry"), CEA's chief financial officer, had full authority to enter into transactions on behalf of CEA. Solomon, however, was the sole owner of all the outstanding shares of CEA. In May of 1995, in a Personal Financial Statement submitted to FTU, Solomon estimated the current value of his ownership interest in CEA at $2,522,565.00. He also identified Kenneth Martin as his personal attorney.[5]

Solomon filed personal bankruptcy on February 6, 1997 and received a discharge. During the course of his Chapter 7 case, six surety companies,[6] FTU and the Chapter 7 Trustee appointed in the case filed adversary proceedings against him and various family members and related entities, seeking, among other things, the denial of Solomon's discharge under 11 U.S.C. § 727(a). Solomon, the Chapter 7 Trustee and the parties to the litigation entered into a global settlement in September of 1998 pursuant to which Solomon and his spouse agreed to pay the Chapter 7 Trustee $110,000 and to execute a non-recourse promissory note in the amount of $750,000 secured by all real estate standing in the name of the Solomons or entities controlled by them. The Stipulation, which the Court approved on October 27, 1998, provided that, if the promissory note were

---

4. FTU does not specifically state whether the amounts sought for interest include both pre- and postpetition interest. As an admittedly undersecured creditor, it would not be entitled to postpetition interest. *See* 11 U.S.C. § 506(b).

5. Solomon represented, warranted and certified that the information on the Personal Financial Statement was true, correct and complete.

6. The sureties were CNA Surety Companies and Fireman's Insurance Company of New Jersey with a claim in the amount of $2,563,-043.00, plus a contingent claim in the amount of $407,673.00; Amwest Surety Insurance Company with a claim in the amount of $535,022.38, plus a contingent claim in the amount of $109,961.11; Gulf Insurance Company with the claim in the amount of $725,-435.62, plus a contingent claim in the amount of $202,643.58; Employers Insurance of Wausau with a claim in the amount of $293,-489.00, plus a contingent claim in the amount of $325,000.00; and Contractors Bonding and Insurance Co. with a claim in the amount of $943,972.14, plus a contingent claim in the amount of $199,650.11.

paid prior to its maturity (September 24, 2003), the payoff amount would not exceed $450,000.00 or less depending upon when the pre-payment occurred.[7]

ATTI is a corporation incorporated under the laws of New York. It designs and manufactures electronic testing equipment. The United States Air Force is one of its largest customers. It contracts with the Air Force both directly as a prime contractor and indirectly as a subcontractor. Gavilla is its president, and Levi is its executive vice-president in charge of contracts and general business matters. Gavilla testified that he owned 55% of its outstanding stock and was in control of the company. Levi testified that he did not own any stock in the company and that he was the corporate officer responsible for ATTI's business relationship with CEA.

In May of 1995, ATTI maintained an existing line of credit with SBLI, a New York banking institution whose vice-president, Michael Sabala ("Sabala"), was the loan officer responsible for the relationship among CEA, ATTI and the Bank. Under ATTI's loan documents, ATTI could borrow funds based on the amount of its accounts receivable, including the receivables owed to it by CEA. SBLI had Assignments of Claims in several of ATTI's government contracts and had a perfected security interest in ATTI's accounts receivable, including the receivables owed it by CEA under the subcontract, which shall be discussed below.

### B. The Government Contract and the CEA/ATTI Business Relationship

In July of 1990, the Debtor entered into an open-ended contract with the United States Air Force, a so-called SEES [Support Equipment Engineering Services] contract (the "Contract"), to provide engineering services at the Kelly Air Force Base in San Antonio, Texas. The Contract was numbered F41608-90-D-0543. The Air Force would, from time to time, issue delivery orders to CEA under the Contract, which orders were numbered sequentially from 1 to 57. Each delivery order related to a specific project or was a continuation of a previous delivery order. Between August 1, 1994 and September 29, 1994, the Air Force issued delivery orders 48, 49, 50, 51, 52, 53 and 55 under which the Debtor was to receive, in the aggregate, a fixed price of $2,850,111.53.[8]

7. The Stipulation also provided the following: In consideration of the voluntary pledge by the Solomons of virtually all of their material assets to the satisfaction of the debts of the Debtor, .... the payments to be made hereunder by the Solomons shall be deemed to be payments by the Debtor pursuant to his guarantees of the CEA indebtedness. Accordingly, the Trustee shall, upon consummation by the Solomons of their obligations to the Trustee hereunder, be deemed to have abandoned, assigned and/or irrevocably transferred to the Debtor all of the bankruptcy estate's rights of subrogation existing as of the Filing Date, or arising thereafter vis-a-vis the assets of CEA, including without limitation, rights arising as a result of the payment by the Solomons hereunder, which subrogation rights are expressly acknowledged by the Trustee, the Bank and the Sureties to have arisen by virtue of the payments made or to be made by the Solomons hereunder....

8. For example, pursuant to delivery order number 48, CEA was to provide engineering services in accordance with a detailed scope of work for the C-5 ground proximity warning system computer circuit card assemblies in exchange for a fixed price of $380,537.00. The "Statement of Work for Software Enhancement in support of the C-5 GPWS Computer Power Supply (A1) and Comparator (A2) CCA's" provided the following background:

> Presently, the Ground Proximity Warning System (GPWS) tester is used for testing the GPWS computer and its circuit card assemblies (CCAs) in support of the C-5 aircraft. The GPWS tester is obsolete, unsupportable and uses 1970's technology. Software for the GPWS CCA tester shall be enhanced to run on the Benchtop Reconfigurable Automatic Tester (BRAT). The BRAT features modular state-of-the-art instrumentation, menu-driven software and a fully programmable (IEEE-488) test platform via a Compaq 486 PC controller. It includes an instrument-on-a-card VXI chassis, and accepts BASIC test software.

(ATTI's Exhibit 8).

The period of performance for the delivery orders was 12 months except in the case of delivery order number 53, which specified a 15 month period. It is unclear from the documents presented what the period of performance was for delivery order number 55.[9]

CEA subcontracted work on the delivery orders numbered 48, 49, 50, 51, 52, 53 and 55 to ATTI for a fixed price of $2,375,092.95 or 20% less than the amount the government had agreed to pay it.[10] In other words, CEA was to receive $475,018.60 for its role in overseeing ATTI's performance under the delivery orders.

CEA and ATTI had worked together on Air Force contracts in the past, exchanging roles of contractor and subcontractor. Barry MacKean ("MacKean"), a former site and program manager at the San Antonio office of CEA and a current employee of ATTI, testified about the circumstances surrounding CEA's decision to subcontract delivery orders 48, 49, 50, 51, 52, 53, and 55 to ATTI:

> [T]he Government user basically comes forward with—he has a requirement. In this particular case it's the same particular government agent had used our contract before with us with a subcontract to ATTI to do this kind of work [sic]. He wanted to continue this work going on through with the same product, the BRAT system, so therefore he asked if

we could do this with them, and I said sure, and established the normal contractor/subcontractor relationship....

(Transcript, February 15, 2000, pp. 58–59). He further testified that he approached the government agent on behalf of CEA to obtain the work exclusively for CEA:

> In that late summer/fall, I in fact approached the government agent ... '94, the summer of '94. With just "How about if we could do this sort of thing" and it was my understanding that based on that discussion, that if it wasn't done through ATTI, well, then it was not going to be done or they would go directly to ATTI and bypass us, so I just backed up and suggested we press on and at least get the 20 per cent cut versus nothing.[11]

(Transcript, February 15, 2000, p. 59).

There were several reasons why CEA utilized ATTI as its subcontractor with respect to the delivery orders. MacKean indicated that CEA lacked the personnel and equipment to perform the required engineering services. Specifically, CEA did not have the Benchtop Reconfigurable Automatic Tester, known as the BRAT (the "BRAT"), required by the government in the Statement of Work to be utilized in completing the delivery orders.[12] Levi corroborated MacKean's viewpoint. He testified that

---

9. The parties stipulated that the period of performance for all delivery orders was between 12 and 15 months.

10. As will be apparent below, there were additional delivery orders that were subcontracted to ATTI by CEA, including delivery orders numbered 23, 35, 42 and 57. The parties did not submit evidence as to either the amount due CEA from the government for these delivery orders or the amount owed by CEA to ATTI for its services as a subcontractor with respect to these delivery orders.

11. The Plaintiffs, in their Reply Brief, objected to this testimony as unreliable hearsay. The Plaintiffs, however, did not object to the testimony during the trial, and their present objection is overruled as untimely. In the absence of any rebuttal evidence that CEA could have performed the work without ATTI's BRAT, the Court finds that MacKean's testimony was more probative than not as to ATTI's unique ability to perform the work under the delivery orders.

12. The Statements of Work associated with delivery orders numbered 46, 49, 50, 51, 52, 53, and 55 all contained a reference to the BRAT. The purpose of the delivery orders was the production of test programs sets that would allow complex pieces of electronic equipment utilized in the C–5 aircraft to be diagnosed for potential electrical faults in the system. *See* Plaintiffs' Exhibits 29–45, ATTI's Exhibit 8.

BRATS are manufactured at ATTI, and I am responsible directly for the shipment of any BRAT that is shipped out of the premises or if a BRAT is manufactured. No BRAT was manufactured and shipped out prior to May of 1995, and that BRAT was shipped to Tinker [Air Force Base] on that date. Other than that, no other BRAT, except for the ones that we owned, were available any other place in the world, except for Europe or NATO.

(Transcript, February 15, 2000, p. 147).

Each delivery order issued by the government to CEA permitted monthly payments from the Air Force for time and material expenses. CEA could request a monthly payment by submitting a "Contractor's Request for Partial Payment." CEA could not submit a Contractor's Request for Partial Payment that included ATTI's charges as subcontractor unless CEA had received an invoice from ATTI for the period for which CEA was seeking a partial payment,[13] as the Request contained the following certification:

> I certify that the above statement ... has been prepared from the books and records of the above-named contractor in accordance with the contract and the instructions hereon, and to the best of my knowledge and belief, that it is correct, that all the costs of contract performance (except as herewith reported in writing) have been paid to the extent shown herein, or where not shown as paid have been paid or will be paid currently, by the contractor, when due, in the ordinary course of business.....

(ATTI's Exhibit 11). CEA would generally be paid by the government within 30 to 45 days of the submission of a Request for Payment. Until the relationship changed, CEA would usually pay ATTI from the monies CEA received from the government. Under each subcontract agreement, CEA was to pay ATTI within 10 days of CEA receiving a payment from the government.

After issuance of the delivery orders, CEA was required to submit monthly reports, as well as scientific and technical status reports, to the Air Force for each delivery order. Prior to February of 1995, ATTI prepared the status reports and submitted them to CEA for CEA to transmit to the Air Force. After February of 1995, ATTI submitted the status reports directly to the Air Force.

In early 1995, CEA's financial health began an inexorable decline. Solomon and McCorry, recognizing a problem, hired Paul White ("White") to assess CEA's internal control policies and procedures and to review CEA's financial condition. White began work in May of 1995. He described CEA's internal control system and its system for general ledger keeping as "very weak." Testifying about the state of CEA's accounts receivable and accounts payable, he stated that

> [T]he whole thing was horrific.... None of it really made sense. There were lots ... of vendors calling about payables and outstanding balances, and the accounts receivable that was [sic] on the books, it didn't appear like it—you know, every time I tried to find out the status of it, it didn't appear to be collectible and they were going into default with contracts and there were some court cases involved with some of them, so it was kind of hard to get [a] handle of the whole general ledger system.

(Transcript, December 8, 1999, p. 41).

ATTI was among CEA's creditors who were not being paid. In early 1995, Levi

---

**13.** It is not clear whether ATTI submitted monthly invoices to CEA. ATTI's Exhibit 8, comprised of the delivery orders numbered 48, 49, 50, 51, 52, 53, and 55 issued by CEA to ATTI, contained modifications that indicated that as of October 20, 1994 ATTI had been billing and would continue to bill "on a contractual basis, not by progress payments." Invoices either prepared by CEA or on behalf of CEA by ATTI for submission to the government were not introduced into evidence. Similarly, invoices, if any, prepared by ATTI and submitted to CEA for ATTI's services were not introduced into evidence.

became concerned about payments that were 60 to 90 days over due. Levi testified that McCorry and Solomon initially advanced a number of excuses to explain late payments, including problems with the government and CEA's computer system. Levi was unable to verify any problems with performance at Kelly Air Force Base and became increasingly uncomfortable with the excuses he was being given by Solomon and McCorry. Additionally, in March of 1995, he learned from McCorry that CEA was in fact being paid by the government. As a consequence, ATTI ceased submitting invoices to CEA and also stopped preparing monthly status reports. ATTI, however, continued to perform engineering services at Kelly Air Force Base under its subcontract without any significant disruption in the work schedule.

On May 25, 1995, Levi sent Solomon the following letter, which succinctly summarized the problems ATTI was having with CEA as well as a possible solution:

It becomes necessary to document our current situation concerning the work we are doing for you as a subcontractor. For the last year payments on amounts invoiced by us have continued to deteriorate, even after repeated requests. Average collections for invoices from June 1994 through September 1994 were in excess of sixty (60) days. Invoices from October through December exceeded seventy-five (75) days. At the present time receivables ... are outstanding in excess of ninety (90) days.

I understand that these amounts were assigned by you in March, 1995 ... to Fleet National bank [sic] with which you have a line of credit. Since you found it necessary to pledge this contract to the Fleet National Bank as a condition of financing in order to obtain your line of credit we have been unable to process

any further work or issue invoices since February 1995 on the delivery orders referenced above....

My concern is that since the contract has been assigned to Fleet National Bank and all payments made will be collected by them in satisfaction of any outstanding receivables that you have with them, it is evident, as it has been for the last several months, that we cannot process any further invoices to you. Some of these delivery orders are approaching delivery due dates and will require immediate action and therefore the agency for a resolution is mandatory.

It would be my intention to have State Bank [of Long Island], which is the bank we do business with, lend you the 20% portion which represents the difference between our contract amount and your contract amount.... CEA would agree to allow State Bank to collect the full amount on these delivery orders and disburse to ATTI its portion and retain the CEA portion as payment on the loan outstanding. CEA would add to the list of delivery orders those that belong to CEA alone and amounts received on these delivery orders would be sent to CEA. This assignment will be an irrevocable transaction on the part of CEA and CEA would agree not to prepay or remove such assignment from State Bank until all delivery orders that ATTI was a part of have been finalized.

\* \* \* \* \* \*

I have taken the liberty to have the documents prepared for your review which can form the framework for this transaction to occur. I am proposing a solution to you by which, [sic] CEA could obtain financial relief through an assignment of the contract with co-ownership by ATTI....[14]

14. Levi attached two schedules to his letter. One outlined the subcontract amounts and balances due as of April 30, 1995, and the other delineated the outstanding receivables.

His schedules revealed that CEA and ATTI had a contractor/subcontractor relationship, as of April 30, 1995, with respect to delivery orders numbered 20, 23, 28, 35 and 42, as

(Plaintiffs' Exhibit 2). CEA elected to obtain the financial relief offered by ATTI.

### C. The ATTI/SBLI Relationship

At the time, Levi communicated ATTI's proposal to Solomon to resolve the issue of late payments, ATTI maintained a line of credit with SBLI which exceeded several million dollars. Moreover, SBLI held a perfected security interest in all of ATTI's accounts receivables, including its receivables from CEA resulting from the subcontract, and SBLI had advanced monies to ATTI against the receivables CEA owed it under the subcontract.

### D. The CEA/FTU Relationship

In his May 25, 1995 letter to Solomon, Levi correctly stated that CEA had assigned it accounts receivable to Fleet Bank ("Fleet"). Indeed, on April 12, 1994, CEA had assigned the Kelly Air Force Base Contract to Fleet pursuant to the Assignment of Claims Act. Additionally, on March 9, 1994, prior to the date of the assignment, it had granted Fleet an all asset security interest in, and Fleet had filed UCC financing statements against CEA's assets, including its accounts receivable.

In the Spring of 1995, CEA, for an undisclosed reason, determined to switch lenders. According to FTU's "Commercial Business Proposal" prepared by Andrew S. Garfinkle ("Garfinkle"), a bank vice-president, and Donna Herman ("Herman"), an analyst, "John Solomon, as CEO and owner of CEA, Inc., has requested that First Trade Union Savings Bank extend a $1.6MM [sic] working capital line of credit and a $750,000 term note." (Plaintiffs' Exhibit 30). According to Garfinkle and Herman,

> [t]he line will be used to finance short term working capital needs with repayment from the conversion of the company's current assets. The line will be priced at prime plus 3/4%. Availability on the line will be limited to an advance rate of 75% of contract receivables under 90 days old and excluding the balance of the $750M term note. The $750M, five-year term note will also be priced at prime plus 3/4%. *The principal will be repaid in level payments of $12,500.00 per month. Repayment will be from the cash flow of the company,* with the guarantor's assets as the secondary source of repayment. The two notes will be cross-collateralized and cross-defaulted.

(Plaintiffs' Exhibit 3) (emphasis supplied).

Garfinkle and Herman, though noting a "decrease in gross margins from 27% to 16% for 1994" and a two fold increase in debt to net worth ratios for 1994 "due to a 78% increase in trade accounts payable and the $1.499M outstanding on the $1.6MM [sic] line of credit originated by Fleet Bank in 1994," determined that "[t]he balance sheet of CEA, Inc. reflects a well-capitalized and liquid company." (Plaintiffs' Exhibit 30). Garfinkle and Herman also reported that the Kelly Air Force Base Contract represented 35% of that customer base. They apparently did not speak with CEA's new employee, White, to ascertain his opinion about the fiscal health of CEA or question in their Proposal why CEA would elect to borrow money with higher debt service than what it previously had with Fleet.

In June of 1995, FTU paid off the Debtor's obligations to Fleet and became the Debtor's primary lender. In the Loan and Security Agreement it executed, CEA agreed that it would not permit, "without the prior written consent of Lender [FTU], . . . the creation or continued existence, whether by voluntary action or operation of law, of any security interest in or other encumbrance on the Collateral." (Plaintiffs' Exhibit 26). According to the loan documents, the imposition of a lien on FTU's collateral would constitute an event of default rendering the unpaid balance of the notes and all unpaid accrued interest

well as delivery orders numbered 48, 49, 50, 51, 52, 53 and 55.

due and payable at FTU's option without notice or demand.

On June 1, 1995, FTU filed a UCC financing statement against the CEA's assets, including accounts receivable and contract rights. A few days later, on June 5, 1995, Fleet terminated its financing statement covering CEA's assets. By mid-June, CEA had expended all the loan proceeds advanced by FTU. The Plaintiffs, however, submitted no evidence as to whether or for how long CEA was able to service its debt to FTU before filing its bankruptcy petition. FTU did not learn of the transaction, described in detail below, pursuant to which ATTI completed performance under CEA's Contract at Kelly Air Force Base and CEA assigned the Contract to SBLI, until sometime in 1996 or 1997 when Attorney Martin contacted FTU and informed it of the transaction.[15]

E. *The Agreement between CEA and ATTI and the Assignment of the Contract to SBLI*

On or around June 21, 1995, CEA and ATTI entered into an agreement (the "Agreement") which contemplated the following: 1) the execution and delivery of an assignment of all proceeds of the various delivery orders to SBLI; 2) the establishment of an account with SBLI into which all proceeds of the Contract would be deposited and from which checks might be drawn and other withdrawals made with the duly authorized signatures of both CEA and ATTI; and 3) a loan from SBLI

to CEA in the amount of $10,000.00.[16] (SBLI's Exhibit 3). Additionally, CEA and ATTI executed various other documents, including a Corporate Resolution and Banking Agreement and an Assignment of Deposit Account (SBLI's Exhibit 2); CEA executed a Promissory Note in the Principal Sum of $10,000.00 and a Commercial Security Agreement in favor of SBLI (SBLI's Exhibits 4 and 5); CEA and SBLI executed an Assignment of Claim under Government Contract (the "Assignment")(SBLI's Exhibit 13); and CEA, ATTI and SBLI executed an Indemnity Agreement (SBLI's Exhibit 6).

Pursuant to the Agreement, CEA and ATTI specifically agreed that ATTI would prepare "each and every invoice, Contractor's Request for Progress Payment, DD250 or other request for payment ("invoice") to be submitted to the U.S. Government in connection with the Contract," although CEA was to be responsible for the truth and accuracy of the invoices. Each invoice was to be accompanied by a first check payable to ATTI to be drawn on the Account in the amount of the share of the proceeds due to be paid to ATTI and a second check payable to CEA to be drawn on the Account in the amount of the share of the proceeds due to be paid to CEA. Upon CEA's approval of the invoice, CEA was to sign both the invoice and the checks attached to the invoice and then return the invoice and checks to ATTI. At that point, ATTI was to submit the invoice

---

**15.** John K. Malloy, III, a former executive vice-president and loan officer at FTU, in response to questions posed by Attorney Martin, testified as follows: "You [Attorney Martin] called me up and made reference to this arrangement with ATTI and that you thought that we should pursue some action against them." (Transcript, December 6, 1999, p. 32). FTU obtained relief from the automatic stay on December 20, 1995. Apparently it took no action to investigate the status of the Kelly Air Force Base receivable.

**16.** The Agreement provided the following:
WHEREAS, CEA and ATTI intend that the Loan Agreement will include the following

terms and conditions which they understand to be acceptable to the Bank: (i) the principal and interest of the Loan will be due in a single balloon payment at the time of the last payment received by the Bank under the contract and will be paid from the proceeds held in the Account; (ii) the Bank will not terminate its rights under the Assignment until the principal and interest of the Loan are paid in full; and (iii) CEA may not prepay the principal and interest due under the Loan until sixty (60) days after providing notice to the Bank of an intent to prepay.
(SBLI's Exhibit 3).

to the government and to sign and return to CEA the second check payable to CEA. (SBLI's Exhibit 3, ¶¶ 2.1, 2.2). The parties also agreed that "[a]ll amounts due to ATTI ... shall be paid from the first available proceeds held in the Account and CEA's share of such proceeds shall be reduced to compensate ATTI for such amount." (SBLI's Exhibit 3, ¶ 2.5). Neither CEA nor ATTI was to present a check for payment unless and until the government made full payment on the invoice and the proceeds were deposited into the Account.

CEA also agreed to "permit ATTI, on a continuous and permanent basis, access to its Contractor Invoice Service ("COINS") system with the DOD" and agreed to "provide ATTI with it's [sic] ID# (password) and point of contact as Defense Finance and Accounting Service...." (SBLI's Exhibit 3, ¶ 2.4). Moreover, CEA granted ATTI a power of attorney "to do such acts and execute such documents in order to (i) submit invoices to the U.S. Government without approval of CEA; and (ii) sign checks on behalf of CEA" in the event of bankruptcy or an insolvency proceeding. (SBLI's Exhibit 3, ¶ 2.8).

Pursuant to their Agreement, the parties also stated that CEA would not prepay the Loan from SBLI and that any attempted prepayment would constitute a material breach of the Agreement. (SBLI's Exhibit 3, ¶ 3.1). CEA also represented the following to ATTI:

> CEA represents and warrants that there does not now exist, and covenants that it shall not grant or suffer or permit to exist at any time, any security interest, lien, charge, encumbrance, attachment or other interest or claim of any third party in or to the Account except as expressly stated in this Section 3.5. CEA represents the Bank has an interest in the Account up to the amount of the principal and interest on the Loan. Furthermore, CEA hereby grants to ATTI a security interest in and lien on the Account to secure the obligations of CEA herein and under the Subcontract and agrees that upon default by CEA in any of its obligations herein, ATTI shall have the rights and remedies of a secured party upon default as provided in the New York Uniform Commercial Code....

(SBLI's Exhibit 3, ¶ 3.5). Finally, the parties agreed that their Agreement would be governed by New York law. (SBLI's Exhibit 3, ¶ 4.4).

The purpose of the Agreement was "to establish a procedure for the disbursement of the proceeds of the Contract," which presupposed payment by the government for work performed upon completion of the Contract. Moreover, the Agreement, and in particular CEA's promise not to prepay the SBLI loan, which would have had the effect of destroying the Assignment of Claim pursuant to which the government was to pay SBLI, was to protect ATTI from "a loss of value and goodwill with respect to the U.S. Government" and to protect it from "irreparable harm" to its reputation and standing as a government contractor. (SBLI's Exhibit 3, ¶ 3.3).

On June 21, 1996, Levi, on behalf of ATTI, and John A. Solomon, on behalf of the Debtor, executed a form captioned "Corporate Resolution and Banking Agreement," in which the corporation was identified not as single entity but as both CEA and ATTI.[17] On the same day, SBLI

---

17. The Resolution provided in pertinent part the following:

**RESOLVED:**

 **Deposit Authorization (Accounts)**

 1. The State Bank of Long Island (hereinafter called the "Bank") be and hereby is designated a depository of the funds of this Corporation, and [sic]

**Designate Authorized Signing Officers(s) By Title Only** N/A
**Designate Authorized Signing Non Officer(s) By Name** EVP [Executive Vice–President] of ATTI AND ONE OTHER JOINTLY
**Number of Signatures Required** 2
**Special Instructions** ELI LEVI AND ANY ONE SIGNER [sic] JOINTLY ...

agreed to loan $10,000 to CEA, and CEA executed a promissory note in favor of SBLI in the amount of $10,000 plus interest payable at the rate of 7.500% per annum on the unpaid principal balance. The loan was payable on December 29, 1995. In executing the note, CEA granted SBLI right of setoff against any account it had with SBLI. (SBLI's Exhibit 4).

As security for the loan, CEA executed a "Commercial Security Agreement," pursuant to which it agreed to assign its Contract (No. F41608–90–D–0543) with the Air Force to SBLI. As part of the Commercial Security Agreement, CEA represented the following: "[t]he execution and delivery of this Agreement will not violate any law or agreement governing Grantor [CEA] or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of the Agreement." (SBLI's Exhibit 5). As additional security for the loan, SBLI received a certificate of deposit from Levi and Gavilla in the amount of $10,000, as well as their personal guaranties. Sabala indicated that he required security for the loan from Levi and Gavilla because he did not believe CEA was creditworthy.[18]

Additionally, on June 21, 1995, CEA, ATTI and SBLI executed an "Indemnification Agreement" pursuant to which the parties represented 1) that CEA was a signatory to a contract to furnish the Air Force with support equipment and engineering services for the San Antonio Logistics Center located at Kelly Air Force Base, Texas; 2) that ATTI was CEA's subcontractor; 3) that CEA, ATTI and SBLI "intended to establish an account (the "Account") into which all proceeds of the Contract will be deposited and from which checks may be drawn and other withdrawals made only with duly authorized signatures of both CEA and ATTI, except for the amount necessary to repay any debt owed to the Bank;" 4) that SBLI intended to loan the Debtor $10,000 secured by the proceeds of the Air Force Contract held in the account; and 5) that CEA authorized ATTI to receive notice about and make inquiries regarding the loan. Based upon these recitals, the parties agreed, among other things, to the following:

> CEA and ATTI shall defend, indemnify, and hold harmless the Bank from all claims, costs, damages, and judgments, including but not limited to the Bank's attorney's fees, resulting from or arising out of: (i) performance of the Contract by CEA and the Subcontract by ATTI; (ii) the use of the Account, including deposits, withdrawals, checks drawn or deposited, and inquiries, whether by

> is hereby authorized (i) to sign for and on behalf of the Corporation, any and all checks, drafts or other orders, with respect to any funds at any time(s) to the credit of the Corporation with the Bank and/or against any accounts(s) of this Corporation maintained at any time(s) with the Bank inclusive of any such checks, drafts or others [sic] in favor of any of the above-designated officer(s) and/or other person(s), and/or (ii) to make withdrawals at any time(s) of any such funds or from any such account(s) by any other means authorized by the Bank ... and the Bank be and hereby is authorized (a) to pay such checks, drafts or orders, and/or to honor such withdrawals by debiting any account(s) of this Corporation then maintained with it; (b) to receive for deposit to the credit of the Corporation, and/or for collection for the account of this Corporation, any and all checks, drafts, notes or other instruments for the payment of money, whether or not endorsed by this Corporation, which may be submitted to it for such deposit and/or collection, it being understood that each such item shall be deemed to have been unqualifiedly endorsed by this Corporation; and (c) to receive, as the act of this Corporation, any and all stop-payment instructions ... with respect to any such checks, drafts or other orders as aforesaid and reconcilement(s) of account when signed by any one or more of the officer(s) and/or other person(s) hereby designated. (SBLI's Exhibit 2).

18. On October 2, 1995, SBLI filed a UCC financing statement specifically covering the Contract and the products thereof, and, several days later, on October 17, 1995, it filed a UCC financing statement covering the Debtor's assets.

CEA or ATTI; (iii) the disbursement of the Loan proceeds and the use thereof, repayment or prepayment, and inquiries, whether by CEA or ATTI; and (iv) the execution by the Bank of this Agreement. The Bank will not be liable to CEA or ATTI for any error in judgment or any act done or step taken or omitted in good faith, or any mistake of fact or law, by the Bank, except for the Bank's own gross negligence and/or willful misconduct.

(SBLI's Exhibit 6, ¶ 1).

On June 23, 1995, Fleet executed a document acknowledging that it had no further interest or claim to moneys due or to become due to CEA under the March 13, 1990 Contract. CEA then assigned its interest in the Contract to SBLI. The Assignment executed by CEA was undated. However, the so-called corporate acknowledgment at the end of the document was dated June 22, 1995. The "Assignment of Claims Under Gov't Contract" provided in pertinent part the following:

FOR VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, *the undersigned* ... [CEA] ... (hereinafter referred to as "Assignor") *hereby assigns, transfers and sets over unto* ... [SBLI] ... (hereinafter referred to as "Lender" or "Assignee") *all moneys due and to become due under* ... [the Air Force contract].... This Assignment is made pursuant to the Assignment of Claims Act of 1940.... *CEA agrees to an irrevocable assignment until contract completion.*

ASSIGNOR HEREBY AUTHORIZES AND DIRECTS the United States of America ... to make all payments due or to become due or owing under the Contract to the Assignee by checks or other orders, payable to the order of the Assignee. Assignor hereby constitutes and appoints Assignee its true and lawful attorney, *irrevocably* with full power of substitution for it and in its name or in the name of the Assignor or otherwise, to ask, require, demand and re-

ceive and give acquittance for any and all said moneys due or to become due, and to endorse the name of the Assignor to any checks, drafts or other orders for the payment of money payable to the Assignor.

ASSIGNOR HEREBY WARRANTS that it is the lawful owner of all rights under the Contract and any and all amendments thereof and supplements thereto; that it has good right to assign the same; that its rights are free and clear of all liens and encumbrances; that it will warrant and defend the same against the unlawful claims and demands of all persons. Assignor agrees (a) that, if any payments under the contract shall be made to Assignor, it will receive and hold the same in trust for Assignee and will forthwith upon receipt deliver the same to Assignee in the identical form of payment received by Assignor; and (b) that it will execute and deliver all such further instruments and do all such further acts and things as Assignee may reasonably request or as shall be necessary or desirable to further and more perfectly assure to Assignee its rights under the Contract.

(SBLI's Exhibit 13) (emphasis supplied).

The Defense Logistics Agency, Defense Contract Management Command, rejected the first Assignment of Claim in favor of SBLI as the Assignment did not meet the strict requirements of the Assignment of Claims Act in that the Assignment was not properly signed and impressed with the corporate seal. (SBLI's Exhibit 12). It accepted a subsequent assignment in mid-July 1995.

Although FTU recorded UCC–1 financing statements covering CEA's assets, ATTI did not discover the financing statements in an initial search conducted by its attorney, George Grammas ("Grammas"). Grammas, however, did discover the UCC–1 financing statements on June 23, 1995, prior to the acceptance of the Assignment by the government in mid-July, 1995. (Plaintiffs' Exhibits 8 and 10).

### F. The Status of the Contract at the Time of the Assignment of Claim

Prior to CEA's decision to execute the Assignment of Claim to SBLI, ATTI was performing under its subcontract, but it was not submitting invoices to CEA or preparing monthly progress reports. Both the Plaintiffs and the Defendants submitted expert testimony as to CEA's ability to complete the performance due under the delivery orders as of June 20, 1995. The Plaintiffs submitted no evidence that ATTI, upon CEA's default, would deliver to CEA the work that it had performed to date or that it would permit CEA to use a BRAT to complete the Contract.

The Defendants' expert, Philip C. Jackson ("Jackson"), received a bachelor's degree in chemical engineering, a master's degree in electrical engineering and a master's degree in management science from Stevens Institute of Technology. He indicated that his entire career has been spent in the "test industry."[19] He opined that the engineering work involved in the preparation of test program sets was idiosyncratic and that it was extremely difficult, if not impossible, for an engineer to complete performance on work initiated by another engineer because of the unique and complex nature of the units under test and the work required to pick up and attempt to complete test program sets.[20] Compounding the problem was the likelihood that the BRAT necessary to complete the work would be unavailable.

Jackson's testimony was corroborated by that of MacKean who was employed by CEA from 1992 through 1995. He testified that CEA could not have completed the delivery orders with its technical abilities. He stated "No one else had the piece of equipment [the BRAT] for one thing, and time and schedule, there was no way that one could have done it." (Transcript, February 15, 2000, p. 63).

The Plaintiffs' expert, Stephen Stenson ("Stenson"), a former colonel in the Air Force, joined CEA in 1990 as a contractor's representative. He stated that at that time he "got into the actual field of automatic test equipment." (Transcript, February 15, 2000, p. 109). His employment with CEA, however, ceased in November of 1993. He indicated that there were a number of companies that were capable of performing the same kind of engineering work as that set forth in the delivery orders to CEA from the government. He opined that CEA was capable of performing the duties of the contractor on the delivery orders because CEA had the professional engineers and technicians on its payroll capable of performing the delivery orders and further that CEA could utilize a BRAT that was located at Tinker Air Force Base.

Stenson explained that in the last phase of the delivery order, i.e., the last 45 days before completion, the engineers are focused on passing tests designed by the

**19.** He described the test industry as follows: Test industry is industry which has grown up primarily due to the complexity of broken electronics. Electronics used to be very simple many years ago, and you could have technicians sit at a bench and repair the electronics when it malfunctioned. These days it is terribly complex that it has gotten past the ability of a human being to fix something when it goes wrong. So in today's day and age, essentially what happens is you have very complex pieces of automatic test equipment—electronics also—that are used to test electronics which may come from airplanes, it may come from medical electronics, computers, whatever—to test that electronics and find out if indeed it is operating correctly, and if it is not

operating correctly, what indeed is wrong and therefore must be fixed.

(Transcript, February 15, 2000, p. 74).

**20.** He stated that "TPSes [sic] are the kind of thing where, unless you are 99 per cent done and all you had to do was perhaps do a little bit of paperwork, any time in there would be very difficult to do it. Fifty per cent, 60 per cent, 70 per cent—very, very difficult." Although he assumed that ATTI would deliver the work for which it had not been paid, he indicated that it would be even more difficult if ATTI was not under an obligation to deliver the work to CEA so that it could complete performance. (Transcript, February 15, 2000, p. 81).

government to detect faults deliberately inserted in the equipment's complex wiring, a process that in his view, involved simply extracting data for purposes of documentation. He testified that it would be possible to hire a professional to perform the required engineering services.

On cross-examination, Stenson admitted that his opinion as to CEA's ability to complete performance was predicated upon ATTI delivering to CEA the engineering work for which it had not been paid. Additionally, he admitted that because the BRAT was so-called CFE [contractor furnished equipment], it would be necessary to negotiate with the government so that the government could obtain a BRAT from ATTI in order for CEA to complete performance under the Contract.

Stenson's testimony that CEA could hire engineers to complete the delivery orders under the SEES Contract was inconsistent with and contradicted by White's testimony. Employed in May to assess CEA's financial condition, he testified that "cash was really tight," (Transcript, December 8, 1999, p. 43), offices were closing and employees were leaving because "we were having trouble meeting payroll at that point." (Transcript, December 8, 1999, p. 43). Indeed, CEA was not meeting its obligations for payroll taxes. Thus, CEA would not have been in a financial position to employ engineers to replace ATTI and to complete performance under the Contract.

The Court also finds that, contrary to the implications of Stenson's testimony, there was important work remaining to be done on the Contract. Although the testimony was far from precise, there was no evidence that CEA was in a position to deliver and to be paid in full for the work performed by ATTI as of mid-June 1995. The Court finds that the weight of the

testimony was that CEA was not in a position to complete performance under the Contract and, absent the completion of performance by ATTI, would have defaulted on its contractual obligations to the government, would have received no further payments pursuant to the Contract, and, in all likelihood, would have been liable for damages for breach of contract.

G. *Payments Pursuant to the Assignment of Claim and the CEA/ATTI Agreement*

On or about September 12, 1995, following the Debtor's execution of a "Disbursement Request and Authorization," SBLI deposited $10,000 into the Account. Between September 15, 1995 and November 24, 1995, SBLI deposited into the Account progress payment checks issued by the federal government with respect to the Contract in the agreed amount of $1,447,068.45[21] and disbursed funds from the account to ATTI and the Debtor in accordance with their joint instructions. All of the checks issued by the federal government were made payable to SBLI for the account of the Debtor or ATTI. These payments, which total $1,447,068.45, are summarized as follows:

| AMT. REC'D | DATE REC'D AT SBLI | INVOICE DATE | DELIVERY ORDER # |
|---|---|---|---|
| $26,725.45 | 10/26/95 | 8/31/95 | 23 |
| $23,871.38 | 10/26/95 | 8/31/95 | 35 |
| $23,926.87 | 11/13/95 | 8/15/95 | 42 |
| $27,219.00 | 10/26/95 | 9/15/95 | 48 |
| $106,760.00 | 9/27/95 | 8/31/95 | 48 |
| $27,983.00 | 10/26/95 | 9/15/95 | 49 |
| $140,576.00 | 9/27/95 | 8/31/95 | 49 |
| $26,990.00 | 10/3/95 | 9/15/95 | 49 |
| $26,563.00 | 10/26/95 | 9/15/95 | 50 |
| $88,929.00 | 9/27/95 | | 50 |
| $46,515.00 | 10/3/95 | 9/15/95 | 50 |
| $29,846.00 | 10/26/95 | 9/15/95 | 51 |
| $4,849.00 | 9/29/95 | 8/30/95 | 51 |
| $186,775.00 | 10/3/95 | 8/31/95 | 51 |
| $23,951.00 | 10/26/96 | 9/15/95 | 52 |
| $56,142.00 | 9/27/95 | 8/31/95 | 52 |
| $75,823.00 | 10/2/95 | 9/15/95 | 52 |
| $42,715.00 | 10/26/95 | 9/15/95 | 53 |
| $322,570.00 | 9/27/95 | 8/31/95 | 53 |
| $43,183.00 | 10/3/95 | 9/15/95 | 53 · |
| $31,175.20 | 10/26/95 | 9/15/95 | 55 |

---

**21.** Proceeds from the Contract were deposited into the joint account. Additionally, proceeds from a contract known as the STARS Contract under which ATTI was the contractor and CEA was the subcontractor also were

deposited into the joint account. Thus, the bank statements issued by SBLI for the joint account show credits/deposits well in excess of $1,447,068.45.

| AMT. REC'D | DATE REC'D AT SBLI | INVOICE DATE | DELIVERY ORDER # |
|---|---|---|---|
| $31,084.37 | 11/4/95 | -- | 56 |
| $12,514.79 | 11/16/95 | -- | 57 |
| $6,292.08 | 9/15/95 | -- | 57 |
| $14,089.30 | 10/4/95 | -- | 57 |

(Plaintiffs Exhibit 62, ¶ 35).

On November 17, 1995, one week before the filing of its bankruptcy petition, the Debtor repaid the loan from SBLI in full, plus interest in the sum of $310.41, from funds in the joint account. CEA received $205,557.38 from the monies deposited into the joint account, and ATTI received $1,241,511.07.[22] There was no evidence as to whether CEA remitted the $205,557.38 it received from the joint account to FTU.

In their answer to the Plaintiffs' Complaint, ATTI raised a variety of defenses to the preference count. The only evidence with respect to a possible defense under 11 U.S.C. § 547(c) can be gleaned from a comparison of the amount of money ATTI alleged was past due as of April 30, 1995 (i.e., $1,182,039.61),[23] and the amount of money ATTI admitted having been paid (i.e., $1,241,511.07), a sum equal to $59,471.46. ATTI did not introduce any evidence in support of its affirmative defenses at trial, however, or make any arguments with respect to them in its briefs. Accordingly, the Court finds that ATTI submitted no credible evidence of a defense to Count IV, the preference count, under § 547(c).[24]

### H. *Solomon's Testimony*

Solomon testified that by entering into the Agreement with ATTI and executing the Assignment of Claim to SBLI he intended to hinder delay and defraud his creditors. He also testified that in mid-June, 1995, approximately one-month after obtaining the term and revolving loans from FTU, the Kelly Air Force Base Contract constituted 98% of CEA's customer base.

The Court finds that the Defendants successfully impeached Solomon's testimony with excerpts from his deposition at which he indicated that he could not recall the circumstances surrounding the June transactions with ATTI and SBLI and that he delegated matters involving ATTI and SBLI to McCorry. Moreover, the Court finds that as a result of the global settlement in his personal bankruptcy Solomon's testimony was biased, and, thus, the Court discounts it as completely unreliable.

## IV. DISCUSSION

### A. *Choice of Law Considerations*

None of the parties considered choice of law issues. The Debtor was a Massachusetts corporation; FTU is a Massachusetts banking corporation. ATTI is a New York corporation; SBLI is a New York banking corporation. The Agreement between CEA and ATTI contained a provision indicating that it would be governed by New York law. CEA's loan documents with FTU contained a provision indicating that they would be governed by the laws of the Commonwealth of Massachusetts.

A federal court hearing a case in diversity must apply the choice-of-law rules of the forum state. *Klaxon [Co.] v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Massachusetts courts give effect to the law reasonably chosen

**22.** In the Third Amended Complaint and in their Post–Trial briefs, the Plaintiffs do not specify a specific dollar amount for alleged preferential transfers or the alleged fraudulent conveyance. They state the following in their Third Amended Complaint with respect to the alleged preferences:

> Plaintiffs pray that the Court enter judgment in favor of the Plaintiffs and against the Defendants in the amount of $1,500,000, or such other amount as ATTI may have received during the period of the Agreement, and grant such other relief as is just and proper.

Third Amended Complaint following ¶ 157. The Defendants in their Post–Trial brief admit that ATTI received $1,241,511.07.

**23.** This figure is contained in an attachment to Levi's letter of May 25, 1995 to CEA.

**24.** The Defendants relied on the Assignment of Claim to argue that CEA conveyed all its interests in the joint account to ATTI outside the preference period.

by the parties to govern their rights under contracts. *Morris v. Watsco, Inc.*, 385 Mass. 672, 674–75, 433 N.E.2d 886, 888 (1982).... The parties' choice-of-law provision will not be honored, however, where its application "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws, § 187(2)(b) (1971).

*Shipley Co., Inc. v. Clark*, 728 F.Supp. 818, 825 (D.Mass.1990) (footnote omitted).

As will be apparent below, the substantive law of New York and Massachusetts are not inconsistent, and thus New York law is not contrary to the fundamental policy of the Commonwealth and vice versa. Accordingly, this Court shall refer to both New York and Massachusetts law.

### B. *The CEA/ATTI Agreement and the Assignment of Claim*

As a preliminary matter, the Court must evaluate what the parties intended by the execution of the Agreement, the Assignment of Claim and the related documents executed on or around June 21, 1995. This is important because the Plaintiffs, depending upon the theory they are espousing, focus on the Assignment of the Contract to SBLI or the distribution of funds from the joint account to ATTI, and a determination of liability under §§ 547 and 548 of the Bankruptcy Code requires a determination of what property interest the Debtor transferred and when.

■ In *Cooperative Centrale Raiffeisen–Boerenleen Bank B.A. v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin*, 778 F.Supp. 1274 (S.D.N.Y.1991), the court stated that

As a matter of law, there are factual circumstances in which the several documents at issue may be considered interdependent. In *Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199 (2d Cir. 1989), the Second Circuit noted, "Two separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended. Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case." *Id.* at 204, *citing Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 769–70 (2d Cir.1975). *Accord Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972).

778 F.Supp. at 1280 (footnote omitted). In *Lowell v. Twin Disc, Inc.*, the court observed that "[i]n determining the parties' intent, the test is 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.'" 527 F.2d at 770 (quoting 6 Williston on Contracts § 863, at 275 (W. Jaeger ed., 3d ed. 1962)). The court in *Cooperative Centrale Raiffeisen–Boerenleen Bank*, observed that

[a]lthough a variation in parties among several documents may argue against considering them as interdependent, it does not, as a matter of law, prohibit them from being so found. *Nat'l Union Fire*, 892 F.2d at 204 *citing Rudman*, 330 N.Y.S.2d at 42, 280 N.E.2d at 873. The fact that all of the documents at issue took effect on the same day ... supports the argument that the separate documents may be considered interdependent.

778 F.Supp. at 1280 (citing *Lowell*, 527 F.2d at 769).[25]

---

25. Massachusetts courts reach similar conclusions. As the court noted in *Rey v. Lafferty*, 990 F.2d 1379 (1st Cir.1993),

The Massachusetts courts sometimes have held that the party to be bound need not

have signed each component part of an integrated agreement where it is the "sense" of the transaction, as supported by reliable indicia in the writings which were signed by the party to be bound, that a

■ Upon consideration of the factual circumstances on and around June 21, 1995, the Court finds that, although CEA, ATTI and SBLI were not signatories to every document, the documents construed together evidence the parties' intention to integrate the promises made and obligations undertaken. Specifically, the Court finds that for valuable consideration, namely the promise to receive its 20% share of the remaining Contract proceeds, CEA transferred its right to receive direct payments from the government to SBLI; SBLI agreed to loan CEA $10,000.00 and to deposit the Contract proceeds into the joint account; and CEA and ATTI agreed to disburse the Contract proceeds first to compensate ATTI for its performance under the subcontract, with the balance of the Contract proceeds payable to CEA. Thus, CEA, on June 21, 1995 transferred to ATTI significant rights and obligations with respect to its Contract at Kelly Air Force Base, including preparation of invoices, Contractor's Request for Progress Payments, DD250's, access to the COIN System, as well as the right to be paid before CEA and a power of attorney in the event of a bankruptcy or insolvency proceeding.[26]

Under this view of the facts, the Court rejects FTU's implicit and sometimes explicit assertions, discussed in detail below, that SBLI obtained dominion and control over the entire balance of the Contract. Not only is such an assertion contrary to the intent of the parties and preposterous as a practical matter, it is contradicted by the execution of the promissory note for $10,000.00 and the Indemnification Agreement in which SBLI agreed to the following:

> WHEREAS, CEA, ATTI and the Bank intend to establish an account (the "Account") into which all proceeds of the Contract will be deposited and from which checks may be drawn and other withdrawals made only with duly authorized signatures of both CEA and ATTI, except for the amount necessary to repay any debt owed to the Bank....

(SBLI's Exhibit 6). Thus, SBLI, while receiving the Contract proceeds from the government, never obtained a right to *all* the proceeds, just a right to be repaid $10,000 plus interest.

### C. *Claims against Levi and Gavilla*

■ Under New York law, plaintiffs may "pierce the corporate veil either 'to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary.'" *Thrift Drug, Inc. v. Universal Prescription Administrators*, 131 F.3d 95, 97 (2d Cir.1997) (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir.1993)). Two requirements must be satisfied: "'(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" 131 F.3d at 97 (quoting *American Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir.1997)). *See also Morris v. New York State Dep't of Taxation and Finance*, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160–61

---

unitary transaction was contemplated by the parties. *See Chase Commercial Corp. v. Owen*, 32 Mass.App.Ct. 248, 588 N.E.2d 705 (1992) (holding that non-signatory guarantor was bound by jury trial waiver contained in loan and security agreements, though guarantee agreement contained no such waiver, where "the three documents were part of one transaction"); *see also Gilmore v. Century Bank & Trust Co.*, 20 Mass.App.Ct. 49, 50, 477 N.E.2d 1069, 1073 (1985) (holding that non-signatory trustee could recover for breach of workout

agreement, even though not a party to its terms, based on "sense" of agreement, and "such factors as simultaneity of execution, identity of subject matter and parties, cross-referencing, and interdependency of provisions").

990 F.2d at 1385–86.

**26.** Of necessity, the Court shall discuss the Agreement between ATTI and CEA in detail below with respect to the Plaintiffs' Preference Count.

(1993) ("While complete domination of the corporation is the key to piercing the corporate veil ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required. The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.").

■ In *Passalacqua Builders v. Resnick Developers South, Inc.,* 933 F.2d 131 (2d Cir.1991), the Second Circuit set forth the following list of factors to determine whether the facts and circumstances of a given situation identify a corporation that has been dominated as to a given transaction for purposes of piercing the corporate veil: 1) whether corporate formalities are observed; 2) whether the capitalization is adequate; 3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; 4) whether there is overlap in ownership, officers, directors, and personnel; 5) whether the corporate entities share common office space, address and telephone numbers; 6) the amount of business discretion displayed by the allegedly dominated corporation; 7) whether the alleged dominator deals with the dominated corporation at arms length; 8) whether the corporation is treated as an independent profit center; 9) whether others pay or guarantee debts of the dominated corporation; and 10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own. 933 F.2d at 139.

■ The test is similar in Massachusetts. In *In re Plantation Realty Trust,* 232 B.R. 279 (Bankr.D.Mass.1999), the court stated the following:

> [U]nder unusual circumstances, a court may disregard the corporate form, particularly to defeat fraud or remedy an injury. *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 618,

233 N.E.2d 748 (1968) (hereinafter, *"My Bread"*). The incidents of common ownership and management, standing alone, are not enough to pierce the corporate veil. In *My Bread* the Supreme Judicial Court described two bases from which to establish the existence of a relationship, justifying the imputation of liability among differing corporate entities: (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. *My Bread,* 353 Mass. at 618–19, 233 N.E.2d 748 (citing cases). In order to evaluate the propriety of such imputation, courts have also considered several factors, including whether a corporation failed to enjoy sufficient capitalization to support the corporate undertaking, failed to observe corporate formalities, failed to pay dividends, was insolvent at the time of a relevant transaction, diverted corporate funds to the dominant shareholders, had nonfunctioning corporate directors and officers (other than the shareholders), failed to maintain corporate records, or was used for the transactions of the dominant shareholders and/or for a fraudulent scheme. *See Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 16 (1985) (hereinafter, *"Pepsi–Cola"*) (also citing *My Bread* with approval). Courts have used similar theories to reach across boundaries separating different legal entities. *See WJM, Inc. v. Commonwealth of Massachusetts (In re WJM, Inc.),* 84 B.R. 268, 273 (D.Mass.1986) (applying

*My Bread* standards in determining whether to include trust assets in the bankruptcy estate of a corporate debtor).

232 B.R. at 282.

■ The Plaintiffs failed to introduce any evidence with respect to the above factors. Indeed, there was no evidence with respect to the complete domination and control over ATTI by either Gavilla or Levi. Gavilla merely testified that he was the president and chief executive officer of ATTI and owned 55% of its outstanding stock. Although he indicated that he was in control of the company, his testimony was not in any way inconsistent with his role as chief executive officer.[27] Levi testified that he was an executive vice-president but did not own any stock in the company. Levi did not dispute that Grammas informed him of FTU's security interest in the Kelly Air Force Base receivable after the execution of the Agreement and the Assignment of Claim and before the Assignment was accepted by the government, and both Levi and Gavilla guaranteed repayment of SBLI' $10,000 loan to CEA. This Court finds that this evidence is totally insufficient to satisfy the tests articulated by either New York or Massachusetts courts for piercing the corporate veil. Moreover, as will be discussed below, the Court finds that ATTI did not convert FTU's receivable or engage in fraudulent conduct toward FTU. Like any business it sought payment for work it performed. Its attorney proposed a solution to a financial problem that ensured that both ATTI *and* CEA received the benefit of their agreement. This conduct does not rise to the level of a wrongful or unjust act toward FTU particularly where FTU neglected its rights both pre- and postpetition. Accordingly, the Court shall not discuss the Plaintiffs' theories of liability with respect to either Gavilla or Levi and shall enter judgment in their favor on all counts of the Third Amended Complaint.

D. *Count II: Conversion and Count III: Turnover*

1. Jurisdiction

■ The Defendants argue that this Court lacks jurisdiction over Counts II and III of the Plaintiffs' Third Amended Complaint because "[r]egardless of FTU's success on Count II or Count III, the distribution of funds of the estate will not be affected." The Defendants maintain that because the bankruptcy estate is administratively insolvent, any reduction in FTU's deficiency claim resulting from a recovery on Counts II and III would have no effect on the bankruptcy estate and the distribution of assets of the estate.

The Plaintiffs disagree. They maintain that under the widely accepted test outlined by the court in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir.1984), the outcome of this proceeding will conceivably have an effect on the bankruptcy estate because of the agreement between FTU and the Trustee set forth in the Application of Chapter 7 Trustee to Employ Special Counsel, which Application was filed on June 6,1997, prior to the filing of the instant adversary proceeding on October 30, 1997. In the Application, the Trustee stated that he and FTU had "agreed that the net recovery, after payment of attorneys' fees and costs, will be divided between First Trade Union and the estate, with the bankruptcy estate receiving 20% of such net recovery and First Trade Union receiving 80% of such net recovery."

The Court conducted a hearing with respect to the Trustee's Application on July 24, 1997. Although the Court authorized the Trustee to employ special counsel, the Court refused to approve the proposed allocation of proceeds between FTU and the Trustee. Nevertheless, in view of the

---

**27.** Gavilla was asked the following question: "You are in control of ATTI, is that right?" In response, he answered: "Absolutely."

276

Agreement between the Trustee and FTU, it is clear that, if special counsel was successful in pursuing Counts II and III, FTU would not retain all monies represented by a judgment in its favor. Thus, there would be monies available to benefit and increase the size of the bankruptcy estate.

### 2. Analysis of Counts II and III

In *General Electric Co. v. Halmar Distributors, Inc.,* 968 F.2d 121, 129 (1st Cir.1992), the court stated that "[l]iability for conversion arises when 'Fone ... intentionally and wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time.'" (citation omitted). In *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 95 (1st Cir.1993), the court articulated four elements to establish a conversion claim:

A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

The elements of conversion are similar under New York law: "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another (3) the rightful owner makes a demand for the return of the property, and (4) the demand for the return is refused." *Richardson Greenshields Securities Inc. v. Lau,* 819 F.Supp. 1246, 1268 (S.D.N.Y. 1993) (citations omitted). With respect to damages, "'the loss is to be measured as of the time of the conversion' ... [and] ...

[t]he date of conversion is the date at which demand was made and refused." *The Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 660 (2d Cir.1994). The Court finds that the Plaintiffs failed to prove both that they made a demand that was refused and damage resulting from the alleged conversion.

FTU states that "[w]hen CEA executed the Assignment of Claims and entered the various agreements to effect the transfer of funds demanded by ATTI, CEA encumbered the Collateral covered by FTU's security interest ... [and] ... violated the terms of its financing agreements with FTU." It thus maintains that it "obtained a superior and immediate right to the funds that were ultimately transferred to SBLI and ATTI." Citing *Harley–Davidson Motor Co., Inc. v. Bank of New England–Old Colony,* 897 F.2d 611, 617–18 (1st Cir.1990), it argues that because the Debtor made an unauthorized transfer of collateral, which constituted a default under its security agreement, it obtained an immediate right to the collateral. FTU further argues that "[a]lthough over $1.5 Million was transferred to SBLI and ATTI through this transaction, CEA could not repay the loan under the Agreement. Such action on the part of ATTI and SBLI sufficiently eliminated First Trade Union's need to demand repayment."

This Court rejects this argument as nonsensical. The Debtor warranted both to ATTI in the Agreement and to SBLI in the Assignment as well as to both in the Indemnification Agreement that it was "the lawful owner of all rights under the Contract," that there was no impediment to the assignment and that its rights were "free and clear of all liens and encumbrances." Prior to acceptance of the Assignment by the government, ATTI learned that FTU had a prior perfected security interest in the account receivable. However, no evidence was submitted that SBLI was apprised by Grammas of FTU's security interest in the Kelly Air Force Base receivable. Additionally, there was no

evidence that FTU made a demand for the receivable either pre- or postpetition. Indeed, the evidence is to the contrary. FTU apparently abandoned its interest in the receivable until it learned of the Assignment to SBLI from Attorney Martin in 1996 or 1997. It cannot now escape the consequences of its own neglect in failing to make a demand. Accordingly, the Court finds that FTU has failed to prove an essential element of conversion, namely a demand.

Moreover, FTU failed to prove another essential element of a claim for conversion, namely that it was damaged as a result of the alleged conversion. At the time CEA executed the Assignment to SBLI and the Agreement with ATTI, the Kelly Air Force Base receivable had no value because ATTI had ceased processing invoices and CEA lacked the financial resources to complete performance. Absent some type of agreement with ATTI, CEA would have defaulted on the Contract and FTU would have received nothing. Indeed, to the ex-

tent that the Debtor received $205,557.38 upon completion of the Contract, FTU's position was improved, although none of the parties submitted evidence as to whether CEA made any payments to FTU between June and November of 1995. If CEA had not entered into the Agreement with ATTI, ATTI would not have submitted invoices to CEA to enable CEA to receive the balance of the Contract proceeds.[28]

Finally, the execution of an Assignment of Claim under the Assignment of Claims Act is akin to a direction to the government to pay a specified lender.[29] At the time FTU disbursed loan proceeds to the Debtor, Fleet had an Assignment of the Kelly Air Force Base receivable. It did not release its Assignment until June 23, 1995, after the Debtor had utilized the loan proceeds from FTU. Although SBLI recorded financing statements with respect to the Contract, its security agreement and financing statements secured a loan in the

---

**28.** The Court is compelled to observe that the defenses of laches or judicial estoppel could have been appropriately been raised in this case. FTU argues in effect that the demand element for conversion can be excused in this case. FTU, however, obtained relief from the automatic stay in December of 1995 and apparently did not investigate the status of its receivable at that time. It certainly made no demand on either SBLI or ATTI at that time because according to Malloy it did not even learn of the Assignment of Claim until 1996 or 1997. Moreover, in filing its Motion for Relief from Stay, it asserted that the account receivable was worth at most approximately $350,000, even though it now seeks in excess of $1.4 million.

**29.** Section 3727 of the Assignment of Claims Act provides in pertinent part the following:

(a) In this section, "assignment" means—
(1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or
(2) the authorization to receive payment for any part of the claim.
(b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made

freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.
(c) Subsection (b) of this section does not apply to an assignment to a financing institution of money due or to become due under a contract providing for payments totaling at least $1,000 when—
(1) the contract does not forbid an assignment;
(2) unless the contract expressly provides otherwise, the assignment—
(A) is for the entire amount not already paid;
(B) is made to only one party, except that it may be made to a party as agent or trustee for more than one party participating in the financing; and
(C) may not be reassigned; and
(3) the assignee files a written notice of the assignment and a copy of the assignment with the contracting official or the head of the agency, the surety on a bond on the contract, and any disbursing official for the contract.
31 U.S.C. § 3727(a)–(c).

amount of $10,000.00 and it had no right to the full amount of the contract proceeds.

The Debtor was entitled to receive the contract proceeds between the time that Fleet released its Assignment of Claim on June 23rd and the government accepted CEA's Assignment to SBLI in mid-July of 1995. FTU failed to require CEA to assign the Contract to it as Fleet had done. Its loan documents required CEA to make a monthly payment of principal and interest; they did not require CEA's account debtors to pay FTU directly through some type of lock-box arrangement. Nor did they preclude CEA from paying its subcontractors. Accordingly, where the Debtor had the right to receive the Contract proceeds and the Assignment of Claims to SBLI did not determine the priority of secured interests in the Contract until such time that SBLI filed financing statements in October of 1995, the Plaintiffs failed to establish that FTU was damaged or could have been damaged in any amount in excess of $10,00.00.

In view of the Court's decision with respect to Count II, the equitable remedy of turnover that the Plaintiffs seek through Count III must fail.[30]

E. *Count I: Fraudulent Conveyance and Counts IV and V: Preferential Transfers*

1. Applicable Sections of the Bankruptcy Code

Both the fraudulent conveyance count and the preference counts require this Court to examine what property interests the Debtor conveyed and when the Debtor conveyed them. Section 547(b) of the Bankruptcy Code provides, in relevant part, the following:

b) Except as provided in subsection (c) of this section, the trustee may avoid *any transfer of an interest of the debtor in property—*

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (emphasis supplied).

Section 548 of the Bankruptcy Code provides, in pertinent part, the following:

a) The trustee may avoid *any transfer of an interest of the debtor in property,* or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor has or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

---

30. The Court notes that the Plaintiffs do not purport to state a cause of action under 11

U.S.C. § 542.

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a) (emphasis supplied).

For purposes of §§ 548 and 547, a transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54).

Section 550 permits the Trustee to recover avoided transfers as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under subsection (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a), (b). Moreover, § 550(d) provides that "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section." 11 U.S.C. § 550(d).

2. Analysis of the Fraudulent Conveyance Count

The Plaintiffs' in their Complaint stated only a general reference to § 548 of the Bankruptcy Code. Moreover, the Plaintiffs failed to specifically state whether they were seeking relief against all the Defendants or only SBLI and ATTI. In their Post–Trial Brief the Plaintiffs made an attempt to rectify these deficiencies by relying upon both subsections (a)(1) and (a)(2) of § 548. The Plaintiffs did not clarify until the filing of their Reply Brief that they are seeking to recover funds from SBLI as CEA's attorney in fact, from ATTI as the recipient of the funds from the joint account, and from Levi and Gavilla.[31]

■ The Court finds that Plaintiffs' legal theory with respect to § 548 is devoid of merit and predicated upon a skewed

---

**31.** The Plaintiffs argue the following in their Reply Brief:

Defendants Levi and Gavilla are principals of ATTI. They asserted themselves into the transaction at issue personally by pledging personal assets to secure the loan to SBLI. By using personal assets to accomplish a requirement of SBLI, to effect the assignment of claims, Levi and Gavilla acted outside the corporate entity in which they are principals. As principals, Defendants Levi and Gavilla personally benefitted from the transaction at issue, and ultimately received funds from the transfers. As such, Defen-

dants Levi and Gavilla are transferees pursuant to 11 U.S.C. § 550.

The Plaintiffs failed to note that lending institutions frequently require guaranties from corporate principals secured by personal assets. Indeed, FTU required Solomon to pledge personal assets. Standing alone such conduct does not warrant piercing the corporate veil. Moreover, the Plaintiffs failed to submit any evidence with respect to the allegations that Levi and Gavilla personally benefitted from the transaction and received funds from the transfers.

view of the transactions which took place in June of 1995. With respect to intentional fraud, the Plaintiffs rely upon Solomon's testimony that CEA intended to hinder, delay and defraud FTU by executing the Assignment to SBLI. The Plaintiffs argue the following:

> [T]he evidence and chronology of events concerning the transaction corroborate Mr. Solomon's testimony. The evidence compels the conclusion that CEA, when it assigned the payment stream to SBLI did so with the expectation that CEA's ability to make payments on FTU's loan would be substantially impaired. Prior to the assignment, Fleet Bank was collecting all of CEA's receivables on the Kelly Contract. The Kelly Contract represented substantial cash flow for CEA, constituting approximately 98% of CEA's contract base. CEA received the FTU Loan and immediately paid off the loan to Fleet Bank to satisfy the condition required by SBLI and to effectuate the assignment of claims. The debt service on the FTU Loan was higher than the debt service on the Fleet Bank loan. Within 3 weeks of closing the FTU Loan, and knowing the restrictions in the FTU Loan Agreements, CEA executed the assignment, encumbering the assets representing FTU's collateral in violation of the FTU Loan Agreement. CEA executed the assignment under extreme financial distress, and with no clear vehicle for increasing its cash flow to cover the obligation on the FTU Loan....

> Based on the foregoing, it is axiomatic that CEA intended to hinder and delay repayment to FTU.

(Plaintiffs' Post–Trial Brief, pp. 35–36).

The Court rejects the Plaintiffs' argument. In the first place, the Court has found Solomon's testimony to be wholly unreliable and his statements as to an intention on the part of CEA to defraud FTU by making the Assignment to SBLI to be a contrived response to the global settlement in his personal bankruptcy case and his motivation to reduce his personal financial exposure. With respect to Solomon's testimony that the Kelly Contract comprised 98% of CEA's contracts, the Court finds that, if this statement is believed, any fraud associated with FTU was common law fraud on the part of either CEA or Solomon that occurred in May of 1995 when CEA borrowed money from FTU. This is because at that time CEA's books revealed, and CEA and Solomon presumably represented, at least to Garfinkle and Harmon, that the Kelly Air Force Base Contract constituted only 35% of the CEA's receivables. Moreover, contrary to the Plaintiffs' present arguments, FTU contemplated that Fleet would be paid from the proceeds of its loans because it intended to obtain a first lien and security interest in all business assets of CEA. There was no evidence that SBLI imposed the condition that the Fleet loan be paid. FTU could not obtain a first position with respect to CEA's assets without first satisfying Fleet's prior perfected security interest in those assets. Indeed, that is what happened when Fleet terminated its financing statements on June 5, 1995.

Finally, the Plaintiffs' arguments with respect to cash flow are devoid of merit as they are predicated upon the assumption that ATTI would complete its performance under the Contract without being paid so that CEA could turnover the Contract proceeds to FTU. The evidence established that CEA's cash flow increased as a result of the completion of the Contract, not that it was diminished as it would have been had CEA defaulted.

■ With respect to evidence of constructive fraud, the Plaintiffs state the following:

> Defendants SBLI, ATTI, Levi and Gavilla received within one (1) year of CEA's bankruptcy petition, over $1.4 Million. The transfer of interests pursuant to the Assignment of Claims was a transfer to the Defendants for which the Debtor received less than a reasonably equivalent value. With respect to SBLI,

in return for an assignment of approximately $1.4 Million in contract receivables under CEA's prime contract with the government, CEA received only a $10,000 loan, disbursed into a joint account with ATTI....

\* \* \* \* \* \*

The transfers were made while CEA was insolvent.

\* \* \* \* \* \*

Defendants were transferees under Section 550 ... and Defendants exercised control and dominion over the funds. ATTI, and ultimately Eli Levi and Hector Gavilla, were the recipients and beneficial transferees of the funds obtained through the Assignment of Claims to SBLI ... ATTI received payments well in excess of any value received by CEA under the transaction. ATTI had knowledge of CEA's difficulty in meeting its payment obligations to ATTI, and thus ATTI knew that CEA was failing to pay debts as they became due. ATTI proposed the Assignment of Claims and forced CEA to accept its proposed resolution to secured payments owed to it; ATTI executed the transactions with knowledge of CEA's financial difficulties, for the sole purpose of securing payments....

\* \* \* \* \* \*

SBLI received an absolute assignment of the contract, and therefore asserted dominion and control over the funds. SBLI actively participated in the Assignment of Claims and transfer of funds to benefit itself and ATTI to the detriment of CEA's prior secured creditor, FTU, and general unsecured creditors.

\* \* \* \* \* \*

SBLI did not act in good faith. SBLI knew the value of receivables that would be transferred from the government, an amount that far exceeded the $10,000

loan amount made pursuant to the assignment.

(Plaintiffs' Post–Trial Brief, pp. 36–39).

The Court rejects this argument as it is predicated upon several unsupported assumptions, namely that ATTI was obligated to continue to perform under its subcontract with CEA without payment; that CEA would be paid by the government even though it was not paying its subcontractor, ATTI; that FTU was entitled to receive all the proceeds of the Contract, leaving ATTI with an unsecured claim; and that SBLI had dominion and control over funds in excess of $10,000.00.

CEA was in default with respect to its subcontract with ATTI, and the Kelly Air Force Base Contract had no value to CEA on June 21, 1995 unless ATTI agreed to complete performance. CEA was unable to complete performance of the subcontract because it was unable to pay ATTI for services that ATTI had rendered and because it lacked the financial resources to employ engineers to complete the work or to obtain, either from the government or from ATTI, the BRAT necessary to complete performance. While the Plaintiffs maintain that the contract was virtually completed in June of 1995, the Court finds that there was significant work remaining to be done. Indeed, ATTI continued to perform services for the government with respect to the delivery orders after the government had accepted performance in September of 1995. Thus, assuming *arguendo* that CEA was insolvent on June 21, 1995, CEA received reasonably equivalent value for its Assignment of the Contract to SBLI and the transfer of rights and obligations to ATTI under the Agreement in the form of its 20% share of the Contract proceeds.

There was no evidence that ATTI "forced CEA to accept its proposed resolution." In view of CEA financial difficulties and inability to perform the Contract without ATTI, the resolution advanced by ATTI enabled CEA to obtain $205,557.38, monies that would have been lost to it

without the Assignment and ATTI's agreement to complete performance under the subcontract. CEA's acquiescence in the use of ATTI's attorney to draft the various documents does not establish, by a preponderance of the evidence, that it was forced to enter into the transaction contemplated by ATTI. Rather, CEA lacked either the financial resources or financial incentive to expend cash, which it lacked, to negotiate and draft documents, particularly because it was to receive the benefit of its bargain under its subcontract with ATTI. There was no evidence, and, indeed, it would be contrary to any reasonable expectation, that ATTI would complete performance under the subcontract without payment so that CEA could turnover the Contract proceeds to FTU.

Viewing the transaction that took place on or around June 21, 1995 as whole, *see* subsection IV.B, *supra*, the Court concludes that CEA and ATTI, in effect, created a vehicle for the benefit of ATTI and the secondary benefit of CEA. As part of the consideration for obtaining its share of the Contract proceeds, CEA executed the Assignment of Claim which ensured that the Contract proceeds essentially would be funneled through SBLI for the benefit of ATTI and indirectly for the benefit of CEA.

The Plaintiffs focus almost entirely on the Assignment of Claim. The Assignment of Claim, although denominated as absolute and irrevocable, did not give SBLI the right to keep the contract proceeds in excess of the amount of its loan to the Debtor in view of the Indemnification Agreement and the intention of the parties. CEA's agreement not to prepay the loan is consistent with that analysis. Clearly if CEA prepaid the loan, the Assignment of Claim would be unsupported and CEA would be entitled to receive the Contract proceeds directly. ATTI, given CEA's prior payment history, understandably was not willing to incur the risk of nonpayment and, therefore, insisted that CEA forego the right to prepay the loan, thereby ensuring that monies would flow through SBLI into the joint account.

In this Court's decision with respect to SBLI's Motion for Summary Judgment, the Court recognized an issue as to whether, as the assignee of "all moneys due and to become due" under the Air Force Contract, SBLI obtained dominion and control over those monies such that it was not a mere conduit for the funds. The Plaintiffs emphasized the Assignment of Claims Act, but the Court found that the Assignment of Claims Act was irrelevant to the instant dispute where the United States paid SBLI "A/C Computer Engineering ASC" under its Contract with CEA.[32] Thus, the Court determined that "the issue of SBLI's dominion and control over the monies due and to become due under CEA's contract with the Air Force could be determined with reference to the agreements signed by CEA, ATTI and SBLI and the common law respecting assignments." Slip op. at 268.[33]

---

**32.** The Court stated the following:

Given that the purposes of the Assignment of Claims Act are to prevent the potential for multiple payment of claims, to eliminate the need for the investigation of alleged assignments, and to enable the government to deal with only one claimant, *see generally* Jean F. Rydstrom, "Modern Status and Application of Rule that Only Voluntary Transfer or Assignment of Claim Against United States Is Within Assignment of Claim Act (31 U.S.C.A. § 203, 41 U.S.C.A. § 15)," 44 A.L.R.Fed. 775, 1979 WL 52361 (1979), the enforceability of CEA's assignment under the Act is not implicated in the present dispute. *Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823 (5th Cir.1959), *reh'g denied,* 274 F.2d 320 (1960), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). In short, the Act is for the protection of the government and only the United States may assert it. *United States v. Certain Space in the Property Known as Chimes Bldg.,* 320 F.Supp. 491 (D.N.Y.1969), *aff'd,* 435 F.2d 872 (2d Cir.1970), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971). Slip op. at 267–268.

**33.** In its decision dated August 28, 1998, this Court discussed *Miller v. Wells Fargo Bank International Corp.,* 406 F.Supp. 452 (D.N.Y.

On the face of the assignment, CEA appears to have intended a present transfer of its right, title and interest in all funds due and to become due under the Contract and that the assignment was neither conditional nor revocable until the completion of the Contract. Nevertheless, pursuant to the Indemnification and an examination of the June 1995 transaction as a whole, the Court finds that SBLI intended to deposit monies into the joint account and that its rights vis a vis CEA were limited to the $10,000.00 loan amount. In other words, SBLI could not keep for itself the full amount of the Contract proceeds and was simply a conduit for the Contract proceeds. *See Bonded Financial Services, Inc. v. European Amer. Bank,* 838 F.2d 890 (7th Cir.1988). *See also Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson &*

1975), *aff'd,* 540 F.2d 548 (2d Cir.1976), and *King v. Tuxedo Enterprises, Inc.,* 975 F.Supp. 448 (D.N.Y.1997). In *Miller,* the court set forth the following statement of New York law on the subject of assignments:

> The test for the existence of an assignment is considerably more stringent than that for the existence of an agreement to pledge. While an assignment need not be in writing, and need not utilize any particular form or phrase, it must have divested the assignor of all right, control and interest in the property assigned, and transferred the same entirely to the assignee.
>
> ***
>
> [I]t is clear that an agreement between two parties in which the first agrees to pay the amount he owes to the second out of a specific fund does not constitute an assignment of that fund. The theory underlying this principle is that the debtor continues in control of the fund until payment is actually made, and the retention of control over the subject matter is inconsistent with an assignment of it.
>
> It is equally clear that an instruction by one party to his obligor to pay a second party does not constitute an assignment of that obligation. Such an instruction is a "mere direction, revocable (by the first party) at will."
>
> Since an assignment requires a complete divestiture of control, the retained power to revoke precludes the creation of an assignment.

*Casey),* 130 F.3d 52, 58 (2d Cir.1997), *cert. dismissed,* 524 U.S. 912, 118 S.Ct. 2295, 141 L.Ed.2d 154 (1998). Moreover, CEA could, in effect, revoke the Assignment of Claim by prepaying the $10,000 loan to SBLI, although it represented to ATTI that it would not do so.

In view of the foregoing, the Court finds that the Plaintiffs failed in their burden of proof with respect to Count I as to ATTI and SBLI. Moreover, they did not submit a shred of evidence that Gavilla or Levi received Contract proceeds in any identifiable amount. Accordingly, judgment shall enter in favor of the Defendants on Count I.

### 3. Analysis of the Preference Counts
### (i) Count V: The Insider Preference Count

Having found that SBLI was a mere conduit with respect to the Contract pro-

> ***
>
> [A]n assignment requires an agreement, whereby the assignor agrees to transfer presently all right, title and control over the subject matter of the assignment to the assignee. Such an agreement may be manifested by conduct, writing or parol, and in particular it exists where the assignor instructs his obligor to pay the specific fund owing to him to the assignee, and the assignor either delivers that order to the assignee or notifies him of it. . . .

406 F.Supp. at 473–74 (citations omitted).

With respect to New York law on conditional assignments, the court in *King* explained the nature of conditional assignments as follows:

> [T]he assignor need not divest control over the funds if he or she intends a "conditional assignment" as security, i.e. an assignment of claims payable in the future to secure performance of an independent obligation. When such assignment is made to secure a loan, "the transfer is conditioned upon the assignor's default in repayment of the loan."
>
> Thus, unlike most assignment, the essential feature of a conditional assignment is that the assignor retains title to the collateral, so long as he or she continues to perform his or her contractual obligations to the assignee. The assignment is effected only if the assignor is in default to the assignee.

975 F.Supp. at 452 (citations omitted).

ceeds, *see Bonded Financial*, 838 F.2d at 893–94, the Court must be determine the preference counts in relation to the joint account. The issue is what if any interest CEA retained an interest in the joint account. In other words the issue is whether the CEA made preferential transfers to ATTI when the checks made payable to ATTI from the joint account were honored, *see Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), or whether the Debtor transferred all its rights with respect to the Contract to ATTI pursuant to the Agreement and related documents, such that the relevant transfer occurred outside the preference period on the date the Agreement was executed. The issue is critically important because if the execution of the Agreement is the determinative "transfer" date, the transfer was outside the 90–day preference period and, thus, the Trustee could only avoid the transfer if ATTI, Gavilla, and Levi are determined to be insiders of the Debtor.

■ Preliminarily, the Court finds that ATTI, Gavilla and Levi were not insiders of the Debtor as that term is defined in 11 U.S.C. § 101(31)(B).[34] The Plaintiffs submitted no evidence that either Gavilla or Levi were directors or officers of the Debtor. Moreover, there was no persuasive evidence that they were in control of the Debtor. They may have exerted a substantial degree of economic leverage over the Kelly Air Force Base Contract as a result of CEA's financial predicament, their unique ability to perform under the Contract due to ownership of the BRAT, and their relationship with the government and SBLI, but they had no control over the Debtor. They were not involved in the decision to hire White, to borrow money

from FTU, to represent to SBLI that there were no encumbrances on the Contract, or to employ bankruptcy counsel and file for protection under the Bankruptcy Code. Given the evidence that CEA had numerous contracts and several offices nationwide, the Plaintiffs failed to prove that ATTI, Gavilla or Levi controlled the Debtor for the purpose of extending the look back period for preference avoidance to one year. Accordingly, judgment shall enter in favor of the Defendants on Count V.

(ii) Count IV: The Preference Count

■ With respect to Count IV, the Court finds that the only issue is when the transfer or transfers of "an interest of the debtor in property" occurred. This is because it is undisputed that ATTI received $1,241,511.07 from the joint account in satisfaction of amounts due under its subcontract with CEA, which monies were "to or for the benefit of" ATTI, "for or account of an antecedent debt," that CEA owed ATTI, and that the Debtor was presumptively insolvent at the time ATTI received the monies. *See* 11 U.S.C. § 547(b)(1)–(4) and § 547(f). Moreover, the monies enabled ATTI to receive more than it would have received from the Debtor's administratively insolvent estate. *See* 11 U.S.C. § 547(b)(5).

The Plaintiffs argue the following with respect to what the Debtor transferred and when:

> Pursuant to the Assignment of Claims, SBLI only received the right to $10,000 from any proceeds generated under the Kelly Contract. All other funds transferred pursuant to the Assignment of Claims were held for the benefit of CEA. ATTI's claim to the funds was

---

**34.** The Bankruptcy Code defines an "insider" to include

 (B) if the debtor is a corporation—
 (i) director of the debtor;
 (ii) officer of the debtor;
 (iii) person in control of the debtor;
 (iv) partnership in which the debtor is a general partner;

 (v) general partner of the debtor; or
 (vi) relative of a general partner, director, officer, or person in control of the debtor....

11 U.S.C. § 101(31)(B).

through the subcontract agreement and delivery orders with CEA. ATTI's claim was not against the government, but against CEA. SBLI does not dispute that it held all funds over $10,000 for CEA's benefit. ATTI never filed a UCC–1 or other lien against the receivables. Accordingly, CEA at all times relevant to the transfer of the funds, retained its right to the receivables under its prime contract with the government.

(Plaintiffs Post–Trial Brief, p. 30). The Court finds that this argument ignores the significance of the Agreement which created the joint account. Nevertheless, the Plaintiffs are correct in that at all times CEA was the entity who had the legal right to sue the government under the Contract, and ATTI did not have an independent right to demand payment from the government. Thus, the issue is whether the Agreement so altered the rights between CEA and ATTI that for purposes of § 547(b) the Debtor transferred all its interests in the Contract, and the receivable arising from it, that when checks were issued on the joint account, CEA can be said to have had no interest in the monies in the account.

As this Court has found, the Agreement between CEA and ATTI transferred significant responsibilities to ATTI for preparing invoices and performing under the Contract. Its main purpose, however, was to "establish a procedure for the disbursement of the proceeds of the Contract." The effect of the Agreement and the Assignment was to divest CEA of its ability to obtain the proceeds of the Contract and use them for its own benefit without first paying sums due and owing ATTI under the subcontract. Thus, as a result of the Assignment, SBLI was obligated to deposit the monies into the joint account, and CEA agreed not to repay SBLI until the completion of the contract. Upon the submission of invoices to the government, CEA and ATTI agreed to issue two checks, each representing their respective share of the amount due from the government pursuant to the invoice. Once in the joint account, the withdrawal of any monies required the signatures of Levi and McCorry, and ATTI was entitled to be paid first from the Contract proceeds.

Some of the provisions of the Agreement suggest that CEA relinquished all rights to the Contract proceeds, other than an interest akin to a reversionary interest, when it executed the Agreement. In other words, the Agreement could be viewed as creating a trust whereby CEA was the settlor, CEA and ATTI were co-trustees, the res was the Contract proceeds and the beneficiary was ATTI.[35]

**35.** In *J. Bowers Constr. Co., Inc. v. Williams (In re Williams)*, 233 B.R. 398 (Bankr. N.D.Ohio 1999), the court considered a bank account containing proceeds of an insurance settlement check issued jointly to the debtor for fire damage to her home and to the plaintiff/contractor who had given the debtor an estimate for repairs. The parties agreed the account would be set up so that the signatures of both the defendant-debtor and the plaintiff/contractor would be required to make withdrawals from the account. Unbeknownst to the contractor, the joint account was set up so to permit withdrawals on an individual signature. The court described the ramifications of the parties agreement as follows:

> [I]t is without dispute that although legal title to the joint account was held by both the plaintiff and the defendant-debtor, the proceeds in that account were being held for the plaintiff's benefit with disbursement

to be made upon completion of the reconstruction work. Such a separation of the legal and beneficial ownership of property is an essential element to the creation of a valid, express trust. *See First Nat'l Bank of Cincinnati v. Tenney*, 165 Ohio St. 513, 518, 138 N.E.2d 15, 18–19 (1956). *See also Smith v. Francis*, 221 Ga. 260, 144 S.E.2d 439, 444 (1965) (requirement of separation of legal and beneficial title still met when sole beneficiary of trust is also one of multiple trustees).

Another essential element to the creation of a valid, express trust is an identifiable trust res. *First Nat'l Bank of Middletown v. Gregory*, 13 Ohio App.3d 161, 468 N.E.2d 739 (1983). In this case, the joint account proceeds were held in a separate account which was earmarked by the parties for a specific purpose. Further, the funds were not co-mingled with any other assets and the parties intended that they only be ac-

While this view of the Agreement has some merit, particularly because of the specific reference in the Agreement to the Assignment and CEA's promise not to repay the loan from SBLI, the Court finds that CEA retained a significant interest in the Contract and its proceeds. The Contract with the government was not modified by the Assignment and the Agreement. ATTI was not substituted as the prime contractor and could not have sued the government to collect the balance due on the Contract, assuming, for illustrative purposes, that the government breached the Contract. In short, CEA relinquished important rights with respect to the Contract, but it did not relinquish *all* its legal and equitable rights in and to the Contract and its proceeds. Thus, when CEA and ATTI executed checks payable to ATTI and ATTI obtained monies from the joint account and those checks were honored, there was a "transfer of an interest in property of the debtor," for purposes of § 547(b). Because each distribution from the joint account to ATTI involved such a transfer and it is undisputed that all the monies received by SBLI from the government were received within the preference period (and, thus, all the monies distributed to ATTI from the account were distributed during the preference period), ATTI received preferential payments totaling $1,241,511.07.

### F. Count VII: Breach of Covenant of Good Faith and Fair Dealing

 The Plaintiffs contend that ATTI breached its covenant of good faith and fair dealing under the subcontract agreement and delivery orders "by causing to be transferred funds of the Debtor for Defendants' benefit while acting as an insider with considerable control over the financial affairs and decision-making processes of CEA." Both Massachusetts and New York recognize a cause of action for breach of the implied covenant of good faith and fair dealing. *Fortune v. Nat'l Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (Mass.1977); *see also Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (1933); *Components Direct, Inc. v. European American Bank and Trust Co.*, 175 A.D.2d 227, 572 N.Y.S.2d 359, 361 (2nd Dept.1991). In *Augat, Inc. v. Collier*, No. 92–12165–RCL, 1996 WL 110076 at

---

cessed by the written consent of both defendant-debtor and [the contractor]. This segregation of and restriction on the funds further supports the conclusion that the parties intended to create a trust and not merely a debtor-creditor relationship.

If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor, or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.

*Norris v. Norris*, 40 Ohio Law Abs. 293, 57 N.E.2d 254, 259 (App.1943) (citing *Guardian Trust Co. v. Kirby*, 50 Ohio App. 539, 199 N.E. 81 (1935)).

Given the undisputed facts and circumstances surrounding the joint savings account, it is more probable than not that when that account was opened, a trust was established whereby the plaintiff and the defendant-debtor were co- trustees for the benefit of the plaintiff. Because the purpose of that trust was to preserve funds for payment to the plaintiff upon completion of the reconstruction project, the plaintiff's beneficial interest in those funds vested ... when the reconstruction work was completed. Accordingly, the plaintiff had both a property interest in and a right to possession of the proceeds in the joint account when the alleged conversion occurred.

233 B.R. at 404. In a footnote, the court added:

Even if it were determined that an express trust was not created, the plaintiff would have still acquired legal title to the entire balance of funds in the joint account through the application of a resulting trust. Such a trust arises in a situation where legal title to property is acquired by one who, given the facts and circumstances, was never intended to also enjoy the beneficial interest in the subject property. *First Nat'l Bank of Cincinnati v. Tenney*, 165 Ohio St. 513, 515, 138 N.E.2d 15, 17 (1956).

*Id.* at 404 n. 7.

*22 (D.Mass. Feb. 8, 1992), a case cited by the Plaintiffs, the court stated "[s]uch a covenant requires that neither party do anything which would destroy or injure the right of the other party to receive the fruits of its contract." Similarly, in *The Bank of New York v. Sasson*, 786 F.Supp. 349 (S.D.N.Y.1992), the court stated the covenant of good faith and fair dealing:

obligates the promisor only to allow the promisee to reap the benefits of the promised performance; it does not obligate the promisor to make future promises. *See Holmes Protection of New York, Inc. v. Provident Loan Society of New York*, 179 A.D.2d 400, 577 N.Y.S.2d 850, 851 (1st Dept.1992) (The proposed "counterclaims for breach of the implied covenant of good faith and fair dealing are insufficient since they do not allege that plaintiff sought to prevent defendant's performance of the contracts or to withhold its benefits from defendant.") Moreover, so long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest such as extending, or even negotiating the possible extension of, a risky loan. *See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

786 F.Supp. at 354.

█ The Agreement between CEA and ATTI resulted in the completion of the Contract and payment of Contract proceeds to both CEA and ATTI in accordance with the terms of the delivery orders and subcontract. Thus, the Count finds that the Plaintiffs' allegations in Count VII are frivolous at best and sanctionable at worst, particularly as this Court has found that ATTI was not an insider of the Debtor and did not exercise control over it. Accordingly, the Court shall enter judgment in favor of the Defen-dants and against the Plaintiffs on Count VII.

## V. CONCLUSION

█ In accordance with the foregoing, the Court shall enter judgment in favor of SBLI and against the Plaintiffs on Count I. The Court shall enter judgment in favor of Gavilla and Levi and against the Plaintiffs on all counts. The Court shall enter judgment in favor of ATTI and against the Plaintiffs on all counts, except Count IV; and the Court shall enter judgment in favor of the Chapter 7 Trustee/Plaintiff and against ATTI on Count IV in the sum of $1,241,511.07. Because FTU has no standing or authority to bring an action to avoid a preferential transfer, *see Fleet Nat'l Bank v. Doorcrafters (MI of VT) (In re North Atlantic Millwork Corp.)*, 155 B.R. 271, 281 (Bankr.D.Mass.1993) (Assignee of preference claims lacked standing to prosecute claims in converted chapter 11 case), judgment shall enter in favor of ATTI and against FTU on Count IV.